UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                              CRIMINAL ACTION NO.  13-20061

v.                                           DISTRICT JUDGE ROBERT H. CLELAND

                                              MAGISTRATE JUDGE MARK A. RANDON

BYRON PRESTON,

        Defendant.
_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION TO SUPPRESS

### I.  INTRODUCTION

Byron Preston ("Defendant"), indicted for felon in possession of a firearm, moves to suppress the gun and any statement he made to the police following an allegedly unlawful stop (Dkt. No. 13).  The Government responds that the gun and statements were obtained from either a consensual encounter, or a valid *Terry* stop (Dkt. No. 20).  Judge Robert H. Cleland referred the motion to this Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. No. 16).

On March 28, 2013, this Magistrate Judge held a suppression hearing.  Three members of the Detroit Police Department testified: Officers Jackson and Harnphanich and Sergeant Duncan.[1]  Because the officers' encounter with Defendant went beyond a consensual encounter and lacked reasonable suspicion to justify a *Terry* stop, it is **RECOMMENDED** that the motion

---

[1] Defendant did not testify.  The Government called Officer Jackson; defense counsel called Officer Harnphanich and Sergeant Duncan.

to suppress be **GRANTED**.

## II.  FACTUAL FINDINGS[2]

Detroit, Michigan – New Year's Eve – 2012.  It's 9:00 p.m. and dark outside; conditions are clear.  Detroit Police Officers Jackson and Harnphanich are on routine patrol with Sergeant Duncan in an unmarked police vehicle.  They are traveling westbound at 5-10 mph along the "Six Mile Road Corridor" of the Eighth Precinct, an area with a high rate of armed robberies.  On the southwest corner of Six Mile Road and Winthrop Street is a liquor store and a National Tax Service.  These businesses stand off the corner with an adjacent surface parking lot to their east.  At the southeast corner of the parking lot is a white dumpster that is several feet in height, width and length.  Directly south of the dumpster is an alley, which runs east to west behind the businesses and crosses Winthrop.  The scene is depicted in Government Exhibits One and Three (Attached).[3]

As the police vehicle enters the intersection of Six Mile and Winthrop, Officer Jackson, the front passenger, observes Defendant emerge from the alley on the east side of Winthrop.  Defendant is wearing a black hooded jacket and jeans.  According to Officer Jackson, Defendant pauses before crossing Winthrop, looks towards the liquor store and "appears to" take "one or two steps" northbound towards Six Mile. But – after looking "in the direction" of the police vehicle – he "appears to" turn and continues walking westbound in the alley.  As he does,

---

[2] The factual findings are provided in the present tense, crediting the testimony of Officer Jackson, except where indicated.  The testimony of Officer Harnphanich and Sergeant Duncan is not particularly helpful to the analysis: they made few direct observations, instead receiving most of their information from Officer Jackson.

[3] The photographs depict the scene during the day; the incident took place when it was dark outside.  The parties stipulated to the admission of the exhibits.

Defendant passes the white dumpster where Officer Jackson's view of him is temporarily obstructed.

Officer Jackson's testimony as to whether Defendant lingered – for any appreciable length of time – behind the dumpster was equivocal at best and is not credible. It is "possible," he says, that Defendant took a "slight pause" while walking behind the dumpster.[4] Yet, given these scant observations, Officer Jackson concludes Defendant may be casing the liquor store for a robbery and takes further action.

The police vehicle pulls up next to Defendant; his hands are in his pockets. None of the officers draws his weapon, exits the vehicle or threatens Defendant. While seated in the car, Officer Jackson immediately orders Defendant to place his hands in the air and asks him if he has any weapons.[5] Defendant raises his hands and says, "it's in my coat." All three officers exit the vehicle. The gun is recovered. The entire encounter lasts seconds. Defendant is arrested and subsequently charged with felon in possession of a firearm.

### III. CONSENSUAL ENCOUNTERS VERSUS *TERRY* STOPS

The United States Supreme Court has identified three types of permissible, warrantless encounters between the police and citizens: "(1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly

---

[4] Although Officer Jackson thought Defendant should have emerged on the other side of the dumpster sooner than he did, Jackson testified Defendant walked at a normal pace.

[5] Officer Jackson says that before ordering Defendant to raise his hands, he asks Defendant where he is headed. This Magistrate Judge finds this testimony not credible: neither Sergeant Duncan nor Officer Harnphanich recall this preliminary question, and it does not make sense given Officer Jackson's stated concern for his safety upon seeing Defendant with his hands in his pockets.

asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion;' and (3) arrests which must be based upon 'probable cause.'" *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)). The question here is whether the officers' encounter with Defendant was consensual or rose to the level of a *Terry* stop, requiring reasonable suspicion.[6]

### A. Consensual Encounters

Consensual encounters between the police and individuals do not require reasonable suspicion. An officer may approach an individual and "generally ask questions of that individual," or "ask to examine that individual's identification" as long as the officer does not convey that compliance is required. *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991). "In order for a seizure to occur, the encounter must not be consensual and the officers must use physical force or the individual must submit to the officers' show of authority." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (citing *Brendlin v. California*, 551 U.S. 249, 254 (2007)). "[A] consensual encounter becomes a seizure when 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

### B. *Terry* Stops

In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court determined that it was proper, under the Fourth Amendment, for a police officer to stop and question an individual

---

[6] The parties do not dispute that the officers had probable cause to arrest Defendant after the gun was recovered from his coat.

4

where the officer has a reasonable suspicion to believe the individual is engaged in, or about to be engaged in, criminal activity. The Court generally described such police conduct as "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." *Id*. at 20. This determination requires the police officer to have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" stopping the suspect and making an inquiry. *Id*. at 21. The standard is also deemed to be an objective one such that the facts would have to warrant a person of "reasonable caution" to believe that the action was necessary. *Id*. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result [the Supreme Court] has consistently refused to sanction." *Id*. at 22.

These type of encounters between the police and individuals have come to be known as investigatory or *Terry* stops. Courts reviewing the propriety of a *Terry* stop must look at the totality of the circumstances to determine if the officer had a particularized and objective basis for suspecting criminal activity. "In considering the totality of the circumstances, '...[a court] must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)) (additional citation omitted). Additionally, officers are allowed to rely on their training and experience to draw inferences and make deductions about the information available to them. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In evaluating an officer's suspicion for conducting a *Terry* stop, the Sixth Circuit has

instructed courts to properly weigh contextual and non-contextual factors. Contextual factors, "such as high crime [areas], should not be given too much weight because they raise concerns of racial, ethnic, and socioeconomic profiling." *United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012). Non-contextual factors – those particularized and specific to a defendant – are entitled to more weight. *Id.* at 604.

## IV. ANALYSIS

### A. This was not a Consensual Encounter

At the suppression hearing, the Government argued that whether Officer Jackson's directive to Defendant to raise his hands surpassed what might otherwise have been a consensual encounter was a close call. However, considering the totality of the circumstances, a reasonable person would have believed he was not free to leave. At the time Defendant was ordered to show his hands, he was alone, at night, in an alley and had been engaged by three officers in an unmarked car. *See Gentry v. Sevier*, 597 F.3d 838, 844-45 (7th Cir. 2010) ("[w]hen the officers pulled up in their patrol car and one officer exited the car and told Gentry to 'keep [his] hands up,' the officer executed a *Terry* stop"); *United States v. Manzo-Jurado*, 457 F.3d 928, 932 (9th Cir. 2006) (defendant was seized within the meaning of *Terry*, because the officer's "show hands order [to the truck occupants] was a 'meaningful interference' with [defendant's] freedom"); *United States v. Brown*, 2003 WL 23144858 at *3 (N.D.Ill. Dec. 22, 2003) (finding that a *Terry* stop occurred based on facts such as the officer "order[ing] everyone to put their hands up"). Defendant put his hands in the air as ordered, submitting to Officer Jackson's "show of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *United States v. Jones*, 562 F.3d 768, 774-75 (6th Cir. 2009) (there is no seizure, without submission to an officer's show of

6

authority). Therefore, Defendant's encounter with the officers was a *Terry* stop, and the contextual and non-contextual factors must be examined to determine if it was predicated upon reasonable suspicion.

### B. The Seizure Lacked Reasonable Suspicion

The only contextual factor is Officer Jackson's testimony that the area in which the officers were patrolling had a high rate of armed robberies. This Magistrate Judge considers the high crime location as part of the totality of the circumstances, because Officer Jackson suspected Defendant might commit the specific crime that had been occurring in the area. *See Young*, 707 F.3d at 604 ("we considered the high crime context because the specific criminal history of the intersection was the same crime for which the citizen was stopped"). However, as a contextual factor, it is not given too much weight.

There are five non-contextual factors (particularized and specific to Defendant) that the Government argues, in combination with the high crime area, justify a *Terry* stop: (1) it was New Year's Eve;[7] (2) it was 9:00 p.m. and dark outside; (3) Defendant looked towards the liquor store;[8] (4) after taking one or two steps north towards Six Mile, Defendant turned and continued to walk westbound in the alley where he passed by the dumpster – "possibly" taking a "slight pause" behind it;[9] and (5) he was dressed in dark clothing and a hooded jacket.[10]

---

[7] This Magistrate Judge disregards the Government's emphasis that the crime occurred on New Year's Eve where officers are on heightened alert for gunfire *at midnight* – not armed robberies at 9:00 p.m.; the officers had no indication that Defendant had a gun before he was stopped, ordered to show his hands and admitted to it.

[8] On cross examination, Officer Jackson acknowledged that Defendant's look towards the liquor store could simply have been a check for traffic before crossing Winthrop.

[9] The Government's characterizations that Defendant "hurriedly" moved behind a concrete wall to "conceal himself from detection" (Dkt. No. 20, p. 7) are not supported

Having had the opportunity to hear Officer Jackson's testimony and observe his demeanor while testifying, this Magistrate Judge finds his implication – and the Government's argument – that Defendant tried to hide or conceal himself behind the dumpster not credible. It would have been physically impossible to continue walking in the alley without being shielded by the dumpster, and Officer Jackson's testimony as to what may have occurred behind it was far too equivocal to be given any credence. The Government concedes that simply walking away from the police does not give rise to reasonable suspicion. *See Florida v. Royer*, 460 U.S. 491, 498 (1983). And, excluding this testimony, there was "nothing about [Defendant's] conduct ... to transform a permissible walk away from a police officer into a suspicious act." *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011).

In *United States v. Davis*, No. 11-CR-20703, 2013 WL 71821 at *5 (E.D. Mich. Jan. 7, 2013), Judge Denise Page Hood cogently summarized the facts and holding in *Beauchamp*:

> [In *Beauchamp*,] the court held that the officer lacked reasonable suspicion to conduct a *Terry* stop under circumstances somewhat similar to this case. The defendant in *Beauchamp* was spotted by police as he was standing and talking to another man in a housing project. It was in the early morning hours, approximately 2:30 a.m., in mid-February. When the officer approached the defendant, the defendant hurriedly walked away. The officer yelled to his partner to stop the "suspicious suspect." The officer's partner parked near the defendant. The defendant walked behind a fence and then was ordered to stop. The defendant came back from around the fence. The officers stated that the defendant seemed nervous and gave vague answers to their questions about where he was going. The defendant was frisked but nothing was found on him. Following the defendant's consent to a search of his person, several baggies of crack were found on him.

---

by the hearing testimony.

[10] There was no testimony that Defendant's hood was up or otherwise concealing his face.

> The Sixth Circuit, based on the totality of the circumstances, found there was not sufficient reasonable suspicion to stop the defendant. The court found that there was "[n]othing about the conduct ... to transform a permissible walk away from a police officer into a suspicious act." 659 F.3d at 571. The court noted there was no eye contact. But also noted that if there had been-would that have been described as "furtive" or "evasive." *Id.* The court wrote: "The ambiguity of Beauchamp's conduct may be susceptible to many different interpretations, but that does not render it suspicious. An inquiry into reasonable suspicion looks for the exact opposite of ambiguity: objective and particularized indicia of criminal activity." *Id.*

Judge Hood relied on the reasoning in *Beauchamp* to suppress the gun recovered by police following an unlawful stop. *Id.* at *6. The same result should follow here.

That Defendant was walking in a high-crime neighborhood at 9:00 p.m. on New Year's Eve; dressed in dark clothing; looked towards the liquor store; and after looking in the direction of an unmarked police car, changed his course of travel – *walking* away at a normal pace – is simply not enough to find reasonable suspicion. The gun and Defendant's statements obtained after the unlawful stop should be suppressed. *Pearce*, 531 F.3d at 381 (explaining the exclusionary rule and the "fruit of the poisonous tree" doctrine).

## V.  CONCLUSION

The Fourth Amendment requires that courts not consider the correctness of an officer's hunch and the item seized – no matter how damning. Instead, the circumstances preceding the stop must be examined. Because the totality of the circumstances surrounding Defendant's encounter with the officers fall short of reasonable suspicion, the gun and accompanying statements should be suppressed. Therefore, it is **RECOMMENDED** that Defendant's motion be **GRANTED.**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided

for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise  response  proportionate to the objections in length and complexity.  *See* Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

s/Mark A. Randon  
Mark A. Randon  
United States Magistrate Judge

Dated:  April 4, 2013

### Certificate of Service

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, April 4, 2013, by electronic and/or ordinary mail.

10

                                        *s/Eddrey Butts*
                                        *Acting Case Manager to Magistrate Judge Randon*